1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3    UNITED STATES OF AMERICA,    : 18-CR-192 (WFK)
                                  :
4            Plaintiff,           :
                                  : United States Courthouse
5        -against-                : Brooklyn, New York
                                  :
6    KASSIN RIVERS,               :
                                  : Friday, July 30, 2021
7            Defendant.           : 3:00 p.m.
- - - - - - - - - - - - - - - -X
8

9

10      TRANSCRIPT OF CRIMINAL CAUSE FOR A STATUS CONFERENCE
          BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
11              UNITED STATES DISTRICT JUDGE

12

13                A P P E A R A N C E S:

14   For the Government:        JACQUELYN M. KASULIS, ESQ.
                                Acting United States Attorney
15                              Eastern District of New York
                                271 Cadman Plaza East
16                              Brooklyn, New York 11201
                                BY:  JONATHAN B. ALGOR, IV, ESQ.
17                                   Assistant United States Attorney

18   For the Defendant:         FEDERAL DEFENDERS OF NY, INC.
                                One Pierrepont Plaza
19                              16th Floor
                                Brooklyn, New York 11201
20                              BY:  DEIRDRE VON DORNUM, ESQ.

21

22   Court Reporter:        DAVID R. ROY, RPR
                            225 Cadman Plaza East
23                          Brooklyn, New York 11201
                            drroyofcr@gmail.com

24
     Proceedings recorded by Stenographic machine shorthand,
25   transcript produced by Computer-Assisted Transcription.

Proceedings                                    2

1            P R O C E E D I N G S

2

3                    --oo0oo--

4

5        (In open court.)

6        THE COURTROOM DEPUTY:  All rise.

7        Criminal cause for a status conference,

8   Docket Number 18-CR-00192, United States of America versus

9   Kassin Rivers.

10       Would each Counsel please identify themselves and

11  state the names of their representative clients for the

12  record, beginning with the Government.

13       MR. ALGOR:  Good afternoon, Your Honor.

14  Jonathan Algor for the United States, J-O-N-A-T-H-A-N,

15  A-L-G-O-R.

16       MS. PAPAPETRU:  Sophia Papapetru, for

17  MDC, Brooklyn Bureau of Prisons.  Sophia, Papapetru,

18  P-A-P-A-P-E-T-R-U.

19       We have our Associate Warden Melinda King.

20       MS. KING:  Melinda King, M-E-L-I-N-D-A, K-I-N-G.

21       THE COURT:  Good afternoon.

22       Are you all vacc'd --

23       MR. ALGOR:  Yes, Your Honor.

24       THE COURT:  -- fully vacc'd, yes or no?

25       MR. ALGOR:  Yes.

```
                    Proceedings                    3
```

1          THE COURT:  Yes?  You may remove your masks, thank

2    you, pursuant to our Court order.

3          Please be seated.

4          MS. VON DORNUM:  Good afternoon, Your Honor.

5    Deirdre von Dornum, Federal Defenders of New York, standing

6    in for Dawn Cardi, who represents Kassin Rivers.

7          It's my understanding that Mr. Rivers waived his

8    presence today, Your Honor.

9          THE COURT:  Thank you.

10         Are you fully vacc'd?

11         MS. VON DORNUM:  I am, Your Honor.

12         THE COURT:  You may remove your mask as well,

13   Ms. von Dornum.

14         MS. VON DORNUM:  Thank you, Your Honor.

15         THE COURT:  Thank you, Ms. von Dornum.

16         And, Ladies and Gentlemen of the Public, welcome,

17   as well.  We have a rule in the court that for those in the

18   well who are fully vacc'd, they are allowed to remove their

19   masks, but that does not apply to those of you in the

20   public.  So if you please, even if you are fully vacc'd,

21   please keep your mask in place.

22         All right.  We are here on a status conference in

23   the action of the United States of America versus Rivers,

24   18-CR-192-3.  The defendant, Mr. Rivers, is in custody.

25         On August 10th of 2018, the United States

Proceedings                                    4

1   of America filed a criminal complaint against the defendant

2   charging him with bank robbery in violation of Title 18

3   United States Code, Section 2113(d).

4              On August 16th of 2018,

5   the Honorable Magistrate Judge Lois Bloom, arraigned the

6   defendant on the complaint and ordered the defendant

7   detained with leave to reapply and to present a bail package

8   in the future.

9              On August 30th of 2018, the United States of

10  America filed a superseding indictment against the defendant

11  and two Co-Defendants, James McCloud and Rodney Griffin,

12  charging them with one count of bank robbery in violation of

13  Title 18 of the United States Code, Section 2113(a) and

14  2113(d), as in "David."  The superseding indictment also

15  contains a criminal forfeiture allegation.

16             On September 18th of 2018, this Court held its

17  first status conference in the case.  The Government advised

18  the Court it would turn over Rule 16 discovery pursuant to

19  Rule 16 of the Federal Rules of Criminal Procedure to

20  Defense Counsel later that same day.

21             On October 23rd of 2018, the Court held it's next

22  status conference at which time the Government turned over a

23  plea agreement to the defense counsel.  A jury was scheduled

24  to begin trial on this action on Monday, March 4th of 2019,

25  and after multiple adjournments, the trial in this action

Proceedings                                      5

1   was scheduled to commence on June 6th of 2021.  The Court

2   excluded time in the interest of justice to that date.

3          On March 8th of 2019, the Court scheduled a change

4   of plea hearing for April 1st of 2019, but on that day, the

5   defendant chose not to go forward with the plea.  At the

6   request of the defendant, the Court appointed Mr. Joseph E.

7   Kilada, K-I-L-A-D-A, to replace Defense Counsel.

8          On May 6th of 2019, the Court held its next status

9   conference in this case.  The Government advised the Court

10  that it had turned over all Rule 16 Discovery to Defense

11  Counsel.  The parties informed the Court that they were

12  engaged in continued plea negotiations.

13         On October 25th of 2019, the United States

14  of America filed its first *motion in limine*.

15         On April 4th of 2020, the defendant filed a motion

16  seeking bond for an emergency bail hearing due to the

17  COVID-19 pandemic.

18         On April 6th of 2020, the Government filed a

19  response in opposition to that motion.

20         On April 28th of 2020, this Court denied the

21  motion.

22         On May 21st of 2020, Defense Counsel, Joseph

23  Kilada, filed an *ex-parte* motion seeking leave to withdraw

24  as counsel for the defendant.

25         On July 31st of 2020, the Court granted

Proceedings                                    6

1   Defense Counsel's motion and appointed Ms. Dawn Cardi as

2   Counsel for the Defendant.

3         On August 13th of 2020, Defense Counsel Ms. Cardi,

4   requested the Court sign a proposed order directing the

5   Bureau of Prisons, and any other medical providers, to

6   provide Defense Counsel with copies of the defendant's

7   medical records.

8         On August 14th of 2020, the Court ordered any

9   medical provider with medical records in its possession

10  relating to the defendant to disclose immediately those

11  records to Defense Counsel.

12        On September 14th of 2020, the defendant filed a

13  renewed motion for bond.

14        On November 17th of 2020, the Court denied

15  Defendant's renewed motion for bail hearing and order

16  granting his release, which the Second Circuit affirmed, in

17  its wisdom.

18        On July 23rd, 2021, Defense Counsel filed a motion

19  to compel, asking this Court to, quote/unquote, "...so order

20  a letter regarding the defendant's condition at the MDC."

21  Defense Counsel's letter explains that the defendant was in

22  need of hearing aids, which he had not received despite six

23  months of unanswered requests.  Also the defense counsel

24  detailed an urgent call of nature received from the

25  defendant advising the defense counsel that the defendant

Proceedings                              7

1   has been, quote/unquote, "...without toilet facilities, that

2   the officers had refused to either have his toilet repaired,

3   and had refused to allow him to use other toilet facilities

4   and to take him there when necessary."  Defense Counsel

5   noted that AUSA Jonathan Algor has also been trying to reach

6   the BOP regarding the situation to seek a satisfactory

7   resolution but had not at that time received a response.

8           On July 26th of 2021, Defense Counsel moved for a

9   status conference before this Court.  This Court scheduled

10  the status conference on July 27th, 2021, at 2:00 p.m.  At

11  the July 27th, 2021 status conference, AUSA Mr. Jonathan

12  Algor, who is here today, stated that the BOP representative

13  had informed him that the defendant's toilet facility had,

14  in fact, been fixed on Friday evening.

15          The Court inquired about the status of the

16  defendant's hearing aids, to which AUSA Algor stated the

17  defendant was now scheduled for a doctor's appointment in

18  November of 2021.  The Court then scheduled this status

19  conference for today, Friday, July 29th, 2021, to confirm

20  that the defendant's commode, had, in fact, been repaired

21  and to address the status of the defendant's hearing aids.

22          On July 28th of 2021, the Court scheduled a change

23  of plea hearing in the case for Friday, September 3rd of

24  2021, at 12:00 noon.

25          On July 29th of 2021, Defense Counsel, Ms. Cardi,

Proceedings                                        8

1   filed an additional letter with the Court regarding what

2   Defense Counsel described as, quote/unquote, "...continued

3   medical negligent and horrific conditions at the MDC and the

4   MCC." Defense's Counsel's letter also notes she is expected

5   to speak with her client in advance of today's July 30th

6   conference to ask whether he is willing to waive his

7   appearance and to allow Distinguished Counsel

8   Deirdre von Dornum to stand in for Ms. Cardi. Ms. Cardi is

9   attending the funeral of the mother of our judicial

10  colleague, the Honorable Justice Sonia Sotomayor, who's

11  mother passed away. And we send the Justice and the family

12  our condolences.

13          Counsel, is that a fair and accurate summary of

14  the case to date?

15          Beginning with the Government?

16          MR. ALGOR:  Yes, Your Honor.

17          THE COURT:  And Ms. von Dornum?

18          MS. VON DORNUM:  Yes, Your Honor. Thank you.

19          THE COURT:  Thank you.

20          All right.  Well, since this is an application

21  filed by Ms. von Dornum and her colleague, who could not be

22  here today, Ms. Cardi, I will ask Ms. von Dornum to begin by

23  giving me a status update as to where the case stands, in

24  your point of view, and then I will hear from

25  the Government.

Proceedings                                    9

1          MS. VON DORNUM:  Thank you, Your Honor.

2          Yes.  And so arriving at the courtroom today, I

3    had no update.  Mr. Algor had received no factual update.

4    Ms. Cardi has heard nothing from the BOP.

5          As I entered the courtroom, I saw that

6    Ms. Papapetru and AW King were here.  So I inquired as to

7    whether there had been any progress, and Ms. Papapetru

8    informed me that, I'm sure coincidentally, Mr. Rivers is

9    currently at the audiologist.  She does not know if he --

10          THE COURT:  What a coincidence?

11          MS. VON DORNUM:  Yes.

12          She doesn't know if he'll receive his hearing aids

13    today or not, but he is at the audiologist.

14          THE COURT:  Do you mean it is not November and he

15    is there?

16          MS. VON DORNUM:  And he's there, yes.

17          THE COURT:  What a coincidence?

18          MS. VON DORNUM:  Yes.

19          THE COURT:  Go ahead.

20          MS. VON DORNUM:  So I think that is progress as to

21    this very discrete point.

22          She also informed me that his commode was fixed

23    last Friday.  As you've said, I haven't independently

24    confirmed that in any way, but I do understand the

25    representation from the BOP is that it is fixed.

1          THE COURT:  All right.

2          Let me hear from Mr. Algor and then the Board of

3    Prisons.

4          Mr. Algor, what is your understanding of the

5    situation with respect to Mr. Rivers?

6          MR. ALGOR:  Yes, Your Honor.

7          So as I mentioned on Tuesday, I learned that that

8    day that the toilet had been fixed on Friday, and that,

9    again, a plumber had gone there on that day to confirm that.

10   I haven't heard anything regarding any representations from

11   Ms. Cardi or Ms. Ferrone, who also represents Mr. Rivers

12   regarding that confirmation, but that was passed on from

13   MDC.

14         In addition, I did learn regarding the defendant's

15   appointment, which is supposedly happening right now.

16         THE COURT:  Thank you.

17         Let me hear from BOP officials.

18         And, again, would you spell your name for the

19   court reporter?

20         MS. PAPAPETRU:  Sophia Papapetru, P-A-P-A --

21         THE COURT:  And just pull the microphone a little

22   closer to you, please.

23         MS. PAPAPETRU:  P-A-P-A-P-E-T-R-U.

24         THE COURT:  Yes.  Thank you.  Welcome.

25         MS. PAPAPETRU:  Thank you.

Proceedings                                    11

1      THE COURT:  And tell us what the status is with

2   respect to Mr. Rivers.

3      I gather, by the way, I had received from one of

4   your colleagues, an invitation to come to the MDC to inspect

5   it.

6      Is that invitation still extend?

7      MS. PAPAPETRU:  Yes.

8      THE COURT:  Thank you.  Please continue with your

9   report.

10      MS. PAPAPETRU:  The data that I received the

11   information from Ms. Cardi in regards to the toilet was

12   after-hours, and on the following day, I followed up.  And

13   at that time, Mr. Rivers actually made the complaint to one

14   of our executive staff members that was on his unit, and --

15   was our captain, and he immediately notified a manager of

16   our facilities department, and that was rectified

17   immediately.  Generally, if that is something that is

18   brought to the attention of any staff member, it is

19   addressed immediately.  The inmate will be relocated, or it

20   will be rectified.

21      In regards to the hearing aids, I do understand

22   that he was scheduled in March, I believe it was March 9th.

23   I cannot speak on behalf of the scheduling system.  The

24   scheduling is done through an outside vendor for the

25   Board of Prisons, that they are contracted.  And I'm not

Proceedings                                              12

1   sure particularly why there was such an extensive wait.

2   However, our house services administrator moved that --

3   moved multiple appointments around, and I do understand that

4   they were able to be squeezed in today.  And that was

5   confirmed only this morning, so...

6               THE COURT:  Excellent.

7               MS. PAPAPETRU:  Yes.

8               THE COURT:  And does your colleague have anything

9   to say?

10              Do you have anything to say to the Court, ma'am?

11              MS. KING:  Yes.  Sometimes we have --

12              THE COURT:  Would you pull your -- well, just

13  state your name and pull the microphone close to you and

14  keep your voice up.

15              Thank you.

16              MS. KING:  Yes.  I'm Melinda King,

17  Associate Warden at MDC, Brooklyn.

18              Most of the time, we're not aware of these issues.

19  And I was not aware, because I am the Associate Warden of

20  Programs.  However, actually, what I want to say is, when it

21  was brought to my attention that, indeed, his appointment

22  was in March, and he hadn't been scheduled to go to an

23  outside facility until November, and it was actually my

24  decision to contact medical and see if they can get him in

25  as soon as possible; but that was my first time being aware

Proceedings                                                13

1   that he had been waiting that long for the hearing aids,

2   sir.

3            THE COURT:  Thank you.

4            Well, you know, I think that this just shows you

5   the benefit of attention to these matters.

6            But I also want to hear from Ms. von Dornum to the

7   extent that you have ongoing requests or interactions with

8   the Board of Prisons from the Federal Defenders' point of

9   view.

10            Could you take us back, perhaps, a year or two

11   with respect to the, what I refer to as "the Christmas

12   Blackout" issues and just inform the Court as to what the

13   Federal Defenders has done on a global level?  Because as an

14   Article III Court tasked with dealing with my cases and the

15   defendants who appear before me, that's what my focus has

16   been, and that is what we are here to resolve today.  And I

17   am glad to hear we have made some progress.

18            But, Ms. von Dornum, would you just give the Court

19   and the public a sense of where you have been in this?

20            MS. VON DORNUM:  Yes, Your Honor.

21            As you allude to, in January of 2019, the end of

22   January of 2019, beginning of February of 2019, there was a

23   blackout at MDC, Brooklyn caused an by electrical fire,

24   which the Inspector General has determined was caused by

25   negligence in term of maintenance.  That electrical fire led

1   to the shutdown of heat, light, and hot-water systems to the

2   jail.  The jail responded by locking each detainee into

3   their cells for approximately eight days.

4           The Court was not informed that that electrical

5   fire had occurred, was not informed that people had been

6   locked in.  And, in fact, was told by Legal Counsel,

7   everything is fine, the lights are on --

8           THE COURT:  When you say "by Legal Counsel," you

9   mean Legal Counsel --

10          MS. VON DORNUM:  Nicole McFarland.

11          THE COURT:  -- of the --

12          MS. VON DORNUM:  Of the BOP.

13          THE COURT:  -- BOP?

14          MS. VON DORNUM:  Yes.

15          THE COURT:  All right.  Go ahead.

16          MS. VON DORNUM:  It turned out through the efforts

17  of the Court, Congress, the media, and the public that the

18  situation inside was quite different.  I was ordered in by

19  Then Chief Judge Irizarry to tour the facility, together

20  with an investigator from the U.S. Attorney's Office while

21  the blackout was still ongoing.

22          We saw that the lights and heat were out, but we

23  also spoke to numerous people who had received no medical

24  care, even in very extreme distress --

25          THE COURT:  And just to be clear, when you are

```
                         Proceedings                    15
```

1    saying "numerous people," you are talking about --

2              MS. VON DORNUM:  The detainees.

3              THE COURT:  -- the detainees?

4              MS. VON DORNUM:  Right.

5              THE COURT:  All right.  Go ahead.

6              MS. VON DORNUM:  Although, I think it's also quite

7    fair to say that officers were suffering in this

8    circumstance, as well.  They were required to work in the

9    dark and cold and not given sufficient backup in terms of

10   security measures given the situation.

11             So, you know, with the efforts of the Court and

12   the Inspector General of the United States, that situation

13   was investigated.  There were lawsuits filed.  There was a

14   series of findings made, both in court and by the

15   Inspector General, as to what had led to that and the

16   problems with the handling of it.  One thing that was of

17   particular concern was the lack of medical care during that

18   time and the lack of accurate medical records.  So since

19   that time, my colleagues and I, together with members of the

20   court and the U.S. Attorney's Office have tried to work to

21   improve the responsiveness and accuracy of the medical

22   system at the MDC.

23             I would say that those efforts have been an abject

24   failure, that we continue, as evidenced today, to have to

25   handle each situation, even the most routine.  Here we have

Proceedings                                    16

1   a man who is completely deaf, is obviously, it's a security

2   problem if he can't hear people around him.  No one

3   disagrees that he is deaf.  It's not a specialized problem,

4   it's not a contested problem; but yet, it requires

5   the Court's intervention and the Government's intervention

6   to get him back to an audiologist where we're not certain

7   that he will get his hearing aids, even in this now,

8   five-month period.  And that happens only with two

9   conferences, the presence of an associate warden, the

10  presence of counsel, and obviously, there's 1200 other

11  people there.

12          I heard Counsel for the BOP say that appointments

13  had been re-arranged to accommodate Mr. Rivers.  And while I

14  certainly appreciate that, I'm certain that there are other

15  defendants who are under this Court's jurisdiction whose

16  medical appointments were, no doubt, moved back so that he

17  could get these routine hearing aids.

18          I also note that the BOP Legal Representative said

19  that she couldn't address the problems with scheduling, and

20  that the Associate Warden said she had no idea that these

21  problems existed.  So it seems to me that through

22  the Court's efforts, we have identified each of the

23  problems.  First, that the scheduling system is not

24  transparent.  And even the legal department does not know

25  why people have to wait nine months to get hearing aids, if

1    they get them at all.  The person who is in charge of health

2    services is not being told, even when the defendant has

3    asked for hearing aids.  The lawyer has written over and

4    over, and the prosecutor has contacted the jail.  It's only

5    when it escalates to Your Honor that there is attention, and

6    then the person is able to go to the doctor.

7            So it would seem to me that we have an opportunity

8    here to together work to have a different system in place

9    where when a defendant or Defense Counsel requests medical

10   aid and there is no, you know, controversy that that is

11   needed, that the legal department specifically finds out

12   when it will be scheduled, communicates that to the

13   prosecutor, who is part of the Department of Justice, and

14   communicates the need to the Associate Warden in charge of

15   health services so that it can be addressed.  The prosecutor

16   can then communicate it to Defense Counsel if steps need to

17   be taken.  But I think this ongoing black hole of we send 30

18   emails, we write to the Court, we call the prosecutor, the

19   prosecutor calls, and then no one goes to the doctor until

20   you schedule two conferences, that can't be a way to handle

21   1200 people that are under the Court's custody and care.

22           So I would ask the Court to order that going

23   forward when either Defense Counsel or Defendant makes a

24   medical request and that medical request is not

25   controversial, such as this one, that Legal within seven

Proceedings                            18

1    days inform the Criminal AUSA, who has sought that person's

2    detention at the MDC, as to what steps have been taken

3    provide medical records and an update; also inform the

4    Associate Warden if that person cannot be seen within that

5    period.

6              THE COURT:  Well, that is a very interesting

7    application, Ms. von Dornum.  But I learned a long time ago

8    as an Article III Judge that despite my enormous Article III

9    powers, a judge's reach has to bear some relationship to his

10   or her power.

11             So here is what I am going to order the parties to

12   do:  Within 30 days of today, the Federal Defenders will

13   accept the invitation of the BOP that was extended to this

14   Court, but will now be extended to you to visit, or to

15   continue the visits to the MDC at the invitation and working

16   with the Board of Prisons as you have indicated has gone on

17   over the last two years.  Together you will do that with the

18   United States Attorneys for the Eastern District of New York

19   and their investigators as you have been doing for the last

20   two years.  And most importantly, from my point of view, if

21   they elect to join in on one or more of those visits, you

22   will invite -- because I am sure the BOP will do this --

23   invite the Chief Judge of the Eastern District of New York,

24   Chief Judge Brodie; and the Chief Magistrate Judge of the

25   Eastern District of New York, Chief Judge Pollack, with whom

Proceedings                                    19

1   I know the Federal Defenders have been working on these

2   issues for many years and the U.S. Attorney has as well.  So

3   you will extend that invitation to my Chief Judge, and you

4   extend that invitation to Magistrate Judge Pollack, as the

5   Chief Judge.  And they will observe the conditions, if they

6   elect to go.  I am not telling them they have to go, but I

7   suspect that they will be gracious enough to accept your

8   invitation, they will observe the conditions, along with

9   Federal Defenders, that gave rise to this Court's concerns

10  about the treatment of Mr. Rivers about the conditions that

11  have been successfully resolved in his particular case.  But

12  as Ms. von Dornum has pointed out, one down, 1200 to go is

13  not really a very good way to proceed.  Whack-a-mole has

14  never been my strength.

15          Within 30 days of completion of your visit, or

16  visits, the Federal Defenders, and I can direct the

17  Federal Defenders, they are directed to file a written

18  report with my chief judge, Chief Judge Brodie, and with the

19  Chief Judge Magistrate for the Eastern District of New York,

20  Judge Pollack, under whenever terms and conditions the

21  Federal Defenders, two chief judges deem appropriate

22  together sharing both contents with the

23  U.S. Attorney's Office.  We are not here to sandbag anybody.

24  They are going to be involved in the investigation.  You are

25  going to write a report for the chief judge.  It is going to

Proceedings                                    20

1    be on notice with the U.S. Attorneys, and I think the

2    U.S. Attorney's Office, I think that is the way to proceed.

3            Now, if the Federal Defenders and the chief

4    judges, Chief Magistrate Judge Pollack and

5    Chief Judge Brodie and the U.S. Attorney find that

6    appropriate at the end of that process, whenever that is, to

7    file a report with the Board of Judges, with the public, or

8    not, that will be up to you folks who have been doing it.

9    The last thing in the world you want is for this Court to

10   parachute in and be buttinsky when you have been working on

11   these issues.  All right?

12           So I am going to put this in the form of an order

13   so everybody can see what I have ordered and what I have not

14   ordered.

15           MS. VON DORNUM:  (Indicating.)

16           THE COURT:  You can be seated.

17           As I once heard of the Late Judge Barbara Frankel

18   say to a very distinguished counsel, such as yourself, You

19   don't have to stand to listen.  It is okay.

20           But here is the point:  When I was about 14 years

21   old -- I was born in Bed-Stuy, raised in Harlem.  I have one

22   brother two years younger who became a pediatric

23   psychiatrist.  I once asked him if that was because I was

24   his big brother, and he said, Well, what do you think?  I

25   said, Never mind.  I am not going to play the

Proceedings                                    21

1    what-do-you-think game with a shrink.

2         When we got our first car, our parents' first car,

3    it was fairly small, and my brother, Eric, and I were in the

4    backseat, and like teenaged boys, young teenaged boys, 14,

5    12, not always the best behaved, I guess.  Now that I am a

6    parent, I can understand that.  And every now and then,

7    either my father or my mother would say in certain tone of

8    voice, Don't, make, me, come, back, there.

9         And I am saying to the Federal Defenders, I am

10   saying to U.S. Attorney, I am saying to the BOP, and I am

11   saying discreetly to my judicial colleagues who have worked

12   on this, Don't make me come back there, because none of you

13   will be happy if I have to revisit commodes and hearing aids

14   time after time.  This is not about Judge Kuntz.  This is

15   about Mr. Rivers and every Mr. Rivers in the BOP.

16        You guys, the Federal Defenders, U.S. Attorneys,

17   BOP, Social Workers, Chief Judges, and Chief Magistrate

18   Judges have been working on this problem for years.  And

19   when I am told that a distinguished lawyer, like

20   Ms. Dawn Cardi, who has been working on this for years and

21   years and years, and Distinguished Counsel, like

22   Deirdre von Dornum, and the U.S. Attorneys who have been

23   working on this for years, and the social workers and the

24   BOP, and we are talking about six months to get hearing aids

25   when you can gone on Amazon and get generic hearing aids in

1   24 hours and getting a plumber in?  Really?  I am not having

2   it.  Okay?

3            I had one case, if everything I have been told and

4   I believe it is true, that has been muted out.  Good for

5   Mr. Rivers.  Good for Judge Kuntz.  I have done my job as an

6   Article III Judge with a case.

7            But you folks, you Federal Defenders with all the

8   money the taxpayers pay -- and I am an old Wall Street guy,

9   I want what I pay for -- and the U.S. Attorneys and the BOP

10  and the Social Workers and the Chief Judges who do the

11  administration, okay, don't make me come back there.  Don't

12  make me be the point person.

13           We have an elevator through that door (indicating)

14  that is supposed to bring detained individuals up from the

15  holding area downstairs.  It has been broken for six months.

16  When I have criminal defendants in this courtroom now, they

17  have to be walked through the public arena because, for

18  whatever reason, whoever is supposed to work that elevator

19  and fix it, it has not worked for six months.

20           So trust me, I am not the guy you want running the

21  BOP.  I do not want to do it.  It is not my skill set.  I

22  cannot even get the elevator to work in my little part of

23  the forest.  I am not a good superintendent.  You do not

24  want me to be superintendent.  You don't want me to be

25  superintendent.  You guys and gals fix this, because if I

1   have to fix it, you will not be happy.  You will not be

2   happy.

3          I am not going to send criminal defendants to be

4   treated in this fashion, and I am not going to let them out

5   to commit crimes against the people of the Eastern District

6   of New York.  I am not coddling anyone when I say fix the

7   toilets and let them hear what they need to hear.  Okay?

8   This is not about coddling anyone.  This is about a decent

9   reflection of what it manes to be a civilized society.

10          Everyone in this room has proceeded in good faith.

11   But you got to do better, because I am telling you now, if I

12   have to stop the car and get out and go to the back of the

13   car, no one is going to be happy.

14          Tell that to your colleagues.

15          You tell that to your colleagues.

16          Okay.  Is there anything else I can help anyone

17   with today?

18          MR. ALGOR:  Not from the Government, Your Honor.

19          MS. VON DORNUM:  No, Your Honor.  Thank you.

20          THE COURT:  Thank you.

21          We will extend time.  To the extent we need to do

22   that, I will put that in the order, but I believe we are

23   good to go.

24          Have a nice afternoon, everyone.  Get your shots,

25   if you have not, and have a nice day.

Proceedings                                    24

1          I gather some of you are staying for the second

2     round of the Judge Kuntz's Friday afternoon performance?

3               MS. VON DORNUM:  Yes, Your Honor.

4               MR. ALGOR:  Yes, Your Honor.

5               THE COURT:  Thank you.

6               Have a good afternoon.

7               MR. ALGOR:  Thank you, Judge.

8               MS. VON DORNUM:  Thank you, Your Honor.

9               (Matter concluded.)

10

11                         --ooOoo--

12

13

14

15

16

17

18

19

20

21

22

23     *I (we) certify that the foregoing is a correct transcript*
       *from the record of proceedings in the above-entitled matter.*
24
       */s/ David R. Roy*              *3rd Day of August, 2021*
25        *DAVID R. ROY*                     *Date*

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25